No. 21-50715

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STUDENTS FOR FAIR ADMISSIONS, INCORPORATED,
*Plaintiff-Appellant,*

v.

UNIVERSITY OF TEXAS AT AUSTIN; JAMES B. MILLIKEN, CHANCELLOR OF THE
UNIVERSITY OF TEXAS SYSTEM IN HIS OFFICIAL CAPACITY; STEVEN LESLIE,
EXECUTIVE VICE CHANCELLOR FOR ACADEMIC AFFAIRS OF THE UNIVERSITY OF
TEXAS SYSTEM IN HIS OFFICIAL CAPACITY; DANIEL H. SHARPHORN, VICE
CHANCELLOR AND GENERAL COUNSEL OF THE UNIVERSITY OF TEXAS SYSTEM IN HIS
OFFICIAL CAPACITY; JAY HARTZELL, INTERIM PRESIDENT OF THE UNIVERSITY OF
TEXAS AT AUSTIN IN HIS OFFICIAL CAPACITY; BOARD OF REGENTS OF THE TEXAS
STATE UNIVERSITY SYSTEM; DAVID J. BECK, MEMBER OF THE BOARD OF REGENTS IN
HIS OFFICIAL CAPACITY; CHRISTINA MELTON CRAIN, MEMBER OF THE BOARD OF
REGENTS IN HER OFFICIAL CAPACITY; KEVIN P. ELTIFE, MEMBER OF THE BOARD OF
REGENTS IN HIS OFFICIAL CAPACITY; R. STEVEN HICKS, MEMBER OF THE BOARD OF
REGENTS IN HIS OFFICIAL CAPACITY; JODIE LEE JILES, MEMBER OF THE BOARD OF
REGENTS IN HIS OFFICIAL CAPACITY; JANIECE LONGORIA, MEMBER OF THE BOARD
OF REGENTS IN HER OFFICIAL CAPACITY; NOLAN PEREZ, MEMBER OF THE BOARD OF
REGENTS IN HIS OFFICIAL CAPACITY; KELCY L. WARREN, MEMBER OF THE BOARD OF
REGENTS IN HIS OFFICIAL CAPACITY; JAMES C. (RAD) WEAVER, MEMBER OF THE
BOARD OF REGENTS IN HIS OFFICIAL CAPACITY; DANIEL JAFFE, INTERIM EXECUTIVE
VICE PRESIDENT AND PROVOST; RACHELLE HERNANDEZ, SENIOR VICE PROVOST
FOR ENROLLMENT MANAGEMENT AND STUDENT SUCCESS; MIGUEL WASIELEWSKI,
EXECUTIVE DIRECTOR FOR OFFICE OF ADMISSIONS,
*Defendants-Appellees,*

THE BLACK STUDENT ALLIANCE; THE TEXAS ORANGE JACKETS; TEXAS NAACP;
ADAYLIN ALVAREZ; MORGAN BENNETT; LIZ KUFOUR; BRIANNA MALLORIE
MCBRIDE; DESIREE ORTEGA-SANTIAGO; NIMA RAHMAN; ALEXANDRA TRUJILLO;
ROSALEEN XIONG,
*Intervenor Defendants-Appellees.*

On Appeal from the United States District Court
for the Western District of Texas, No. 1:20-cv-763 (Pitman, J.)

**OPENING BRIEF OF APPELLANT
STUDENTS FOR FAIR ADMISSIONS, INC.**

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
Steven C. Begakis
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com

*Counsel for Students for Fair Admissions, Inc.*

## CERTIFICATE OF INTERESTED PERSONS

1. No. 21-50715, *Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*;

2. The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this court can evaluate possible disqualification or recusal:

Students for Fair Admissions, Inc.[*]

CONSOVOY MCCARTHY PLLC

William S. Consovoy

Thomas R. McCarthy

J. Michael Connolly

Cameron T. Norris

Steven C. Begakis

University of Texas at Austin

James B. Milliken, Chancellor of the University of Texas System in his Official Capacity

Steven Leslie, Executive Vice Chancellor for Academic Affairs of the University of Texas System in his Official Capacity

Daniel H. Sharphorn, Vice Chancellor and General Counsel of the University of Texas System in his Official Capacity

Jay Hartzell, Interim President of the University of Texas at Austin in his Official Capacity

Board of Regents of the Texas State University System

---

[*] Students for Fair Admissions has no parent corporation, and no corporation owns 10% or more of its stock.

David J. Beck, Member of the Board of Regents in his Official Capacity

Christian Melton Crain, Member of the Board of Regents in her Official Capacity

Kevin P. Eltife, Member of the Board of Regents in his Official Capacity

R. Steven Hicks, Member of the Board of Regents in his Official Capacity

Jodie Lee Jiles, Member of the Board of Regents in his Official Capacity

Janiece Longoria, Member of the Board of Regents in her Official Capacity

Nolan Perez, Member of the Board of Regents in his Official Capacity

Kelcy L. Warren, Member of the Board of Regents in his Official Capacity

James C. "Rad" Weaver, Member of the Board of Regents in his Official Capacity

Daniel Jaffe, Interim Executive Vice President and Provost

Rachelle Hernandez, Senior Vice Provost for Enrollment Management and Student Success

Miguel Wasielewski, Executive Director for Office of Admissions

GRAVES, DOUGHERTY, HEARON & MOODY, P.C.

John J. McKetta, III

Marianne W. Nitsch

Matthew C. Powers

William Christian

The Black Student Alliance

The Texas Orange Jackets

Texas NAACP

Adaylin Alvarez

Morgan Bennett

Liz Kufour

Brianna Mallorie McBride

Desiree Ortega-Santiago

Nima Rahman

Alexandra Trujillo

Rosaleen Xiong

Hunton Andrews Kurth, L.L.P.

Brian C. Pidcock

Carter C. Simpson

Neil K. Gilman

Ryan P. Phair

Mexican American Legal Defense & Educational Fund, Inc.

David G. Hinojosa

The Lawyers' Committee for Civil Rights Under Law

Genevieve Bonadies Torres

  /s/ J. Michael Connolly

*Counsel for Students for Fair Admissions,*
*Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

The importance of this case is undeniable. Students for Fair Admissions ("SFFA") alleges that the University of Texas at Austin ("UT") is engaging in racial discrimination in its admissions process. "'[D]iscrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong, and destructive of democratic society.'" *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1989) (Scalia, J., concurring in the judgment). Yet the district court held that SFFA's suit was barred by res judicata because one of SFFA's five directors, Abigail Fisher, sued UT thirteen years ago and another SFFA director, Edward Blum, assisted her in her efforts. The decision below was badly wrong. To give this important case the full attention it deserves, SFFA respectfully requests oral argument.

# TABLE OF CONTENTS

Table of Authorities ................................................................................................. vi

Jurisdiction ............................................................................................................... 1

Statement of Issues .................................................................................................. 1

Statement of the Case ............................................................................................. 1

    I.    Students for Fair Admissions ................................................................. 2

    II.   SFFA's Litigation Against Harvard, UNC, and Yale ......................... 5

    III.  The History of UT's Use of Race in the Admissions Process ......... 9

    IV.  Proceedings Below ................................................................................. 13

Summary of Argument ......................................................................................... 18

Standard of Review ............................................................................................... 21

Argument ................................................................................................................ 21

    I.    SFFA's lawsuit is not precluded because SFFA was not a party
        in the *Fisher* litigation and is not in privity with Abigail Fisher. ................... 22

    II.   SFFA's lawsuit is not precluded because this case and *Fisher* do
        not involve the same claim or cause of action. ................................. 31

Conclusion ............................................................................................................. 44

Certificate of Service ............................................................................................ 45

Certificate of Compliance ................................................................................... 46

# TABLE OF AUTHORITIES

## Cases

*Adams v. City of Indianapolis,*
  742 F.3d 720 (7th Cir. 2014) ............................................ 36, 37

*Adarand Constructors, Inc. v. Pena,*
  515 U.S. 200 (1995) ............................................ 30, 31

*Amerisure Ins. Co. v. Navigators Ins. Co.,*
  611 F.3d 299 (5th Cir. 2010) ............................................ 21

*Benson & Ford, Inc. v. Wanda Petroleum Co.,*
  833 F.2d 1172 (5th Cir. 1987) ............................................ 24, 25, 29

*CentraArchy Rest. Mgmt. Co. v. Angelo,*
  806 F. App'x 176 (4th Cir. 2020) ............................................ 23

*Chaplin v. NationsCredit Corp.,*
  307 F.3d 368 (5th Cir. 2002) ............................................ 21

*City of Richmond v. J.A. Croson Co.,*
  488 U.S. 469 (1989) ............................................ iv

*Clyce v. Farley,*
  836 F. App'x 262 (5th Cir. 2020) ............................................ 22, 24

*Doe v. Hesketh,*
  828 F.3d 159 (3d Cir. 2016) ............................................ 24

*Duckett v. Fuller,*
  819 F.3d 740 (4th Cir. 2016) ............................................ 19, 23

*FDIC v. Henderson,*
  61 F.3d 421 (5th Cir. 1995) ............................................ 29

*Ferris v. Cuevas,*
  118 F.3d 122 (2d Cir. 1997) ............................................ 29, 30

*Fisher v. Univ. of Tex. at Austin,*
  631 F.3d 213 (5th Cir. 2011) ............................................ 11, 32, 35

*Fisher v. Univ. of Tex. at Austin,*
  645 F. Supp. 2d 587 (W.D. Tex. 2009) ............................................ 11

*Fisher v. Univ. of Tex. at Austin,*
  758 F.3d 633 (5th Cir. 2014) ............................................ 12

*Garcon v. Van Reeth*,
    511 F. App'x 877 (11th Cir. 2013) ................................................................33

*Grayson v. Warden, Comm'r, Ala. DOC*,
    869 F.3d 1204 (11th Cir. 2017) ........................................................... 23, 24

*Grutter v. Bollinger*,
    539 U.S. 306 (2003) ...........................................................10, 33, 39, 41

*Havercombe v. Dep't of Educ. of Com. of P.R.*,
    250 F.3d 1 (1st Cir. 2001) ................................................................... 20, 36

*Hopwood v. Texas*,
    78 F.3d 932 (5th Cir. 1996) ...................................................................... 9

*Howell Hydrocarbons, Inc. v. Adams*,
    897 F.2d 183 (5th Cir. 1990) ..................................................................24

*Hyatt v. US PTO*,
    904 F.3d 1361 (Fed. Cir. 2018) .............................................................33

*In re Hinsley*,
    149 F.3d 1179 (5th Cir. 1998) ........................................................... 24, 29

*Johnson v. City of Houston*,
    444 F. App'x 26 (5th Cir. 2011)......................................................... 27, 28

*Joseph on behalf of Estate of Joseph v. Bartlett*,
    981 F.3d 319 (5th Cir. 2020) ....................................................................21

*Leaf v. Refn*,
    742 F. App'x 917 (6th Cir. 2018) ...........................................................30

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*,
    140 S. Ct. 1589 (2020) ..............................................................................34

*Meza v. Gen. Battery Corp.*,
    908 F.2d 1262 (5th Cir. 1990) ..........................................................*passim*

*Monongalia Cty. Coal Co. v. United Mine Workers of Am., Int'l Union*,
    416 F. Supp. 3d 587 (N.D. W. Va. 2019) ..............................................32

*NAACP v. Fordice*,
    105 F.3d 655 (5th Cir. 1996) ...................................................................24

*Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*,
    571 F.3d 299 (3d Cir. 2009) .....................................................................24

*Petro-Hunt, L.L.C. v. United States*,
    365 F.3d 385 (5th Cir. 2004) ............................................................*passim*

*Preister v. Deutsche Bank Nat'l Trust Co.*,
    832 F. App'x 240 (5th Cir. 2020) .................................................................38

*Richards v. Jefferson Cty., Ala.*,
    517 U.S. 793 (1996) ..................................................................................22

*SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*,
    397 F. Supp. 3d 126 (D. Mass. 2019) ................................................ 6, 7, 34

*SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*,
    No. 14-cv-14176 (D. Mass.) ......................................................................5

*SFFA v. President & Fellows of Harvard Coll.*,
    No. 20-1199 (S. Ct.) ...................................................................................7

*SFFA v. Univ. of N.C.*,
    No. 14-cv-954 (M.D.N.C.) ..........................................................................8

*SFFA v. Univ. of N.C.*,
    No. 14-cv-954, 2018 WL 4688388 (M.D.N.C. Sept. 29, 2018) ....................8

*SFFA v. Univ. of N.C.*,
    No. 14-cv-954, 2019 WL 4773908 (M.D.N.C. Sept. 30, 2019) ................8, 9

*SFFA v. Univ. of Tex. at Austin*,
    No. D-1-GN-17-2930 (53d Jud. Dist. Ct. Travis Cty., Tex.)...................13

*SFFA v. Yale Univ.*,
    No. 21-cv-241 (D. Conn.) ...........................................................................9

*Smith v. Bayer Corp.*,
    564 U.S. 299 (2011) ..................................................................................22

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) .............................................................................*passim*

*Transp. Concepts, Inc. v. San Fran. French Bread Co.*,
    2000 WL 1175642 (N.D. Tex. Aug. 17, 2000) ............................................21

*United States v. Davenport*,
    484 F.3d 321 (5th Cir. 2007) .....................................................................17

*Walgreen Co. v. La. Dep't of Health & Hospitals*,
    220 F. App'x 309 (5th Cir. 2007) ...............................................................37

*White v. Fox*,
    576 F. App'x 327 (5th Cir. 2014) ...............................................................24

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) ........................................................................ 34, 39

*Wild Fish Conservancy v. EPA,*
   331 F. Supp. 3d 1210 (W.D. Wash. 2018) ........................................32

*Wilson v. Lynaugh,*
   878 F.2d 846 (5th Cir. 1989) ...........................................18, 20, 38

*Xtreme Lashes, LLC v. Xtended Beauty, Inc.,*
   576 F.3d 221 (5th Cir. 2009) ........................................................21

## Statutes

28 U.S.C. §1291 ..........................................................................................1

28 U.S.C. §1331 ..........................................................................................1

28 U.S.C. §1343 ..........................................................................................1

## Other Authorities

Brief for Tex. as Amicus Curiae in Support of Certiorari,
   *SFFA v. President & Fellows of Harvard Coll.,*
   No. 20-1199 (S. Ct. Mar. 30, 2021) ...........................................7, 8

Rest. (2d) of Judgments §24 (1982) ...............................................31, 34, 39

Rest. (2d) of Judgments §59 (1982) ............................................................27

Wright, Miller, & Cooper, 18A Fed. Prac. & Proc. §4451 (2d ed. 2002) ......................28

Wright, Miller, & Cooper, 18A Fed. Prac. & Proc. §4460 (3d ed. 2021) ......................27

## Rules

Fed. R. Civ. P. 56 ....................................................................................21

## JURISDICTION

The district court had jurisdiction because SFFA alleges violations of the Fourteenth Amendment, Section 1983, and Title VI of the Civil Rights Act of 1964. 28 U.S.C. §§1331; 1343. This Court has jurisdiction under 28 U.S.C. §1291 because SFFA appeals from a final judgment. The district court entered that judgment on July 26, 2021, ROA.1545, and SFFA timely appealed on August 5, 2021, ROA.1547.

## STATEMENT OF ISSUES

In 2008, Abigail Fisher, an eighteen-year-old high school senior, sued the University of Texas at Austin for racial discrimination after she was denied admission to the university. Her suit was unsuccessful. In July 2020, SFFA, a 501(c)(3) membership organization founded in 2014, sued UT for discriminating on the basis of race in its admissions process. SFFA had no role in the *Fisher* litigation, and its claims are not the same as Ms. Fisher's. Is SFFA's lawsuit barred under res judicata because two of its five directors, Abigail Fisher and Edward Blum, were involved in the *Fisher* litigation and SFFA alleges that UT's current admissions process violates the Equal Protection Clause?

## STATEMENT OF THE CASE

SFFA is the leading organization in this country fighting for students' right to be free of racial discrimination in the college admissions process. SFFA is a nonprofit membership group of more than 20,000 students, parents, and others who believe that racial classifications and preferences in college admissions are unfair, unnecessary, and

unconstitutional. Since its formation in 2014, SFFA has brought high profile lawsuits against Harvard, the University of North Carolina at Chapel Hill, Yale University, and, here, the University of Texas at Austin. SFFA's cases against Harvard and UNC both went to trial, and SFFA's case against Yale is stayed pending the Supreme Court's decision in *Harvard.* SFFA's case against UT is the only one that was dismissed at the outset.

## I.     Students for Fair Admissions

In early 2014, a group of individuals formed a membership organization dedicated to ending "the use of race and ethnicity in the admissions process" for higher education. ROA.1232:16-1233:17. Those individuals believed that "[m]embership organizations have a source of energy that think tanks and legal advocacy groups just don't have." ROA.1234:19-21. But there was "no membership organization" opposing race-based classifications in college admissions "where people could say I am a member of this group, much like I would be a member of the Sierra Club or the ACLU." ROA.1234:1-11. They named their new association Students for Fair Admissions or SFFA, ROA.1234:12-15, and their goal was to "[e]ducate the American public about the unfair and unconstitutional uses of race by educational institutions in their admissions policies" through "[s]peeches, debates, forums, one-on-one outreach, media communications," and "litigation." ROA.1235:10-1236:1.

On July 30, 2014, SFFA incorporated as a Virginia nonprofit corporation. ROA.1298. SFFA's mission is "to defend human and civil rights secured by law,

including the right of individuals to equal protection under the law, through litigation and any other lawful means." ROA.1308. SFFA's bylaws set forth its membership policies, organizational structure, and leadership positions, including a board of directors and a president. ROA.1308-14. SFFA applied to be a 501(c)(3) nonprofit organization, describing itself as "a coalition of prospective applicants and applicants to higher education institutions who were denied admission to higher education institutions, their family members, and other individuals who support the organization's purpose and mission of eliminating racial discrimination in higher education admissions." ROA.1353. The IRS approved SFFA's application. ROA.1332.

SFFA's membership is open to "[a]ny individual who seeks to support the purposes and mission of [SFFA]," subject to "any additional standards that may be set from time to time by the Board of Directors." ROA.1308-09. In the beginning, individuals could join through SFFA's website or by otherwise expressing an intent to join. ROA.1408. No membership fee was required, as the Board wanted to reduce barriers to joining the organization in its infancy. ROA.1308-09, 1237:1-5, 1334-35.

Membership in the organization grew steadily as news of SFFA's activities spread. ROA.1408. By June 1, 2015, the organization's membership had grown to approximately 350 people. ROA.1408. In early June 2015, after SFFA's president, Edward Blum, spoke to several Asian-American groups in California, New York, and Texas, interest in the organization grew dramatically; thousands of people joined the organization during the first week of June 2015 alone. ROA.1408.

As interest in SFFA increased and the association matured, SFFA amended its bylaws to account for the rapid growth. ROA.1334-45, 1408. To give its members "a direct voice in [its] decision-making, including the management and direction of ongoing litigation," SFFA increased the size of the Board of Directors to five and empowered its members to directly elect one of those directors. ROA.1334-45, 1342. Since then, SFFA's members have elected three different individuals to the Board of Directors: Joe Zhou (2015), Alex Chen (2017), and Hua "Eva" Guo (2019). ROA.1407. In addition, SFFA now offers membership to "[a]ny individual who ... pays membership dues as may be prescribed by the Board of Directors." ROA.1341-42. The Board voted to require new members to pay a membership fee of $10 as of July 30, 2015. ROA.1335. Since then, thousands of individuals have paid the membership fee and become members of SFFA. *See* ROA.1356, 1104, 1133.

SFFA currently has five directors on its board: Edward Blum, Abigail Fisher, Richard Fisher, Joe Zhou, and Eva Guo. ROA.1406-07. Each director serves for a two-year term. ROA.1342. Mr. Blum, who also serves as the President of SFFA, is "responsible for SFFA's ... day-to-day operations, membership recruitment, and efforts to publicize its mission." ROA.1406. Ms. Fisher, who was the named plaintiff in *Fisher v. Texas*, also serves as the secretary of SFFA and is "responsible for keeping an accurate record of the proceedings of all meetings of the Board of Directors." ROA.1407. Mr. Fisher, Abigail's father, also serves as the treasurer and is "responsible for the financial management of the organization." ROA.1407. Mr. Zhou, who was

previously a member-elected director, is a parent whose children suffered discrimination in the admissions process. ROA.1364. And Ms. Guo is a parent of younger children who fears that her children will suffer racial discrimination in the admissions process. ROA.1361. Collectively, SFFA's board of directors is responsible for the operation and management of SFFA, including the filing and direction of its litigation. ROA.1309-10, 1248:14-15.

## II.    SFFA's Litigation Against Harvard, UNC, and Yale

After its founding, SFFA began to bring cases on behalf of its members to stop universities from discriminating on the basis of race in the admissions process. SFFA's case against UT is one of four cases that the organization is currently litigating.

*SFFA v. Harvard.* In November 2014, SFFA sued Harvard University for violating Title VI of the Civil Rights Act. *See SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*, No. 14-cv-14176 (D. Mass.) (Dkt. 1). SFFA alleged that Harvard's admissions process violates Title VI in six ways: intentionally discriminating against Asian Americans; using racial balancing; failing to use race merely as a "plus" factor in admissions decisions; failing to use race merely to fill the last "few places" in the incoming freshman class; using race where there are available and workable race-neutral alternatives; and using race as a factor in admissions. *Id.* SFFA sued on behalf of its members, including Asian-American students who were denied admission to Harvard and who stand ready and able to apply to transfer if Harvard stops discriminating. *Id.*

In response, Harvard concocted an unusual challenge to SFFA's standing. Harvard moved to dismiss under Rule 12(b)(1) on the ground that SFFA's members "play no meaningful role in the organization and thus SFFA does not genuinely represent them." *SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 261 F. Supp. 3d 99, 106 (D. Mass. 2017). Harvard argued that SFFA lacked standing unless its members exhibited the "'indicia of membership.'" *Id.* The District of Massachusetts denied Harvard's motion. *Id.* SFFA was a traditional membership association that had standing to sue on behalf of its injured members. *Id.* at 106-11 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977)). Associational standing, the court explained, does not "turn on a subjective evaluation of whether 'members' are 'genuine' members or not." *Id.* at 107. But even if such facts were relevant, the court found it indisputable that SFFA adequately represented the interests of its members. *Id.* at 110-11.

In October 2018, the District of Massachusetts held a three-week bench trial on SFFA's claims. SFFA presented evidence that Harvard was discriminating against Asian Americans, used race as more than a "plus" factor, engaged in racial balancing, and failed to employ race-neutral alternatives. The court held (for the third time) that SFFA had Article III standing to pursue its claims. *SFFA v. President & Fellows of Harvard Coll. (Harvard Corp.)*, 397 F. Supp. 3d 126, 183-84 (D. Mass. 2019); *see also SFFA v. President & Fellows of Harvard Coll.*, 346 F. Supp. 3d 174, 190-92 (D. Mass. 2018); *Harvard*, 261 F.

Supp. 3d at 106. The court then ruled for Harvard on the merits. *Harvard*, 397 F. Supp. 3d at 184-204.

The First Circuit affirmed. Like the district court, the First Circuit found that SFFA had standing to bring its suit. *SFFA v. President & Fellows of Harvard Coll.*, 980 F.3d 157, 182-84 (1st Cir. 2020). SFFA was a "valid membership organization" that has "associational standing to pursue its claims." *Id.* The First Circuit affirmed the district court's ruling on the merits. *Id.* at 184-204.

In February 2021, SFFA filed a petition for certiorari asking the Supreme Court to review the First Circuit's decision. *See SFFA v. President & Fellows of Harvard Coll.*, No. 20-1199 (S. Ct.), bit.ly/2PKVNnk. Eighteen amicus briefs were filed in support of SFFA's petition, including from Asian-American organizations, a coalition of States, former federal officials, and other interested parties. *See id.* The Supreme Court called for the views of the Solicitor General in June 2021, and a decision on SFFA's petition is expected in the next few months.

Notably, the State of Texas filed an amicus brief in the *Harvard* case, urging the Court to overrule *Grutter v. Bollinger* and prohibit racial preferences in higher education. *See* Brief for Tex. as Amicus Curiae in Support of Certiorari, *SFFA v. President & Fellows of Harvard Coll.*, No. 20-1199 (S. Ct. Mar. 30, 2021), bit.ly/3rIDOuZ. Discussing UT's actions since *Fisher II*, the State of Texas wrote that "[UT's] admissions practices stand as a testament to failures by this Court and lower courts to enforce" strict scrutiny. *Id.* at 15-17. Today, "most African-American and Hispanic students admitted to [UT] are

admitted through the Top Ten Percent Law." *Id.* at 16. Yet the "zeal with which [UT] has embraced systematic racial discrimination in admissions" illustrated how "elite universities will not stop discriminating based on race without this Court's intervention." *Id.*

<u>*SFFA v. UNC*</u>. SFFA sued the University of North Carolina at Chapel Hill on the same day it sued Harvard. SFFA challenged UNC's race-based admissions under Title VI, section 1981, and section 1983. *SFFA v. Univ. of N.C.*, No. 14-cv-954 (M.D.N.C.) (Dkt. 1). SFFA alleged that UNC fails to use race as a mere "plus" factor, uses race where there are available and workable race-neutral alternatives, and uses race as a factor in admissions period. *Id.* SFFA sued on behalf of its members, including white students who were denied admission to UNC and who stand ready and able to apply to transfer if UNC stops discriminating. *Id.*

Copying Harvard's argument verbatim, UNC argued that SFFA lacks standing because its members "lack indicia of membership." *SFFA v. Univ. of N.C.*, No. 14-cv-954, 2018 WL 4688388, at *3 (M.D.N.C. Sept. 29, 2018). The Middle District of North Carolina disagreed. SFFA "satisfied the [three] requirements necessary for associational standing" and thus had "standing to sue on behalf of its members." *Id.* at *3-6 (citing *Hunt*, 432 U.S. at 343). The "indicia-of-membership test," the court explained, "does not apply to voluntary membership associations like SFFA." *Id.* at *3 (cleaned up). Alternatively, the court agreed that "even if such a test applies, 'SFFA would easily satisfy it.'" *Id.* at *3; *see also SFFA v. Univ. of N.C.*, No. 14-cv-954, 2019 WL 4773908, at

*5 n.9 (M.D.N.C. Sept. 30, 2019) (holding at summary judgment that its prior standing holding "shall 'continue to govern' . . . in subsequent stages in this case").

In November 2020, the district court held a two-week bench trial. A ruling on the merits of SFFA's claims is expected soon.

*SFFA v. Yale*. On February 25, 2021, SFFA sued Yale University for violating Title VI of the Civil Rights Act. *SFFA v. Yale Univ.*, No. 21-cv-241 (D. Conn.). SFFA alleged that Yale (like Harvard) violates Title VI in six ways: intentionally discriminating against Asian Americans; using racial balancing; failing to use race merely as a "plus" factor in its admissions decisions; failing to use race merely to fill the last "few places" in the incoming freshman class; using race where there are available and workable race-neutral alternatives; and using race as a factor in admissions. Dkt. 1 at 28-38. SFFA sued on behalf of its members, including an Asian-American student who was denied admission to Yale and who stands ready and able to apply to transfer if Yale stops discriminating. *Id.* at 2. That case is stayed pending the Supreme Court's decision in *Harvard. See* Dkt. 28.

## III.    The History of UT's Use of Race in the Admissions Process

Before 1999, UT used race as part of the general admissions process, and it was frequently a controlling factor in the university's admissions decisions. ROA.176 [¶19]. In 1996, this Court issued its decision in *Hopwood v. Texas*, 78 F.3d 932 (5th Cir. 1996), which held that the University of Texas School of Law could not use race as a factor in

deciding which applicants to admit. In response to *Hopwood*, UT ceased using race as a factor in its undergraduate admissions decisions. ROA.177 [¶23].

In 1997, the Texas Legislature adopted a law known as the "Top Ten Percent Plan," which mandated that UT admit all Texas seniors who rank in the top 10% of their high school classes. ROA.178 [¶29]. From 1998-2004, UT admitted applicants through the Top Ten Percent Plan, as well as by considering other race-neutral factors for those students who were not admitted through the Plan. ROA.178 [¶32]. But in 2004, after the Supreme Court issued *Grutter v. Bollinger*, 539 U.S. 306 (2003), UT adopted a policy to reintroduce race into the admissions process, starting with applicants in the 2004-2005 admissions cycle. ROA.179 [¶¶41-42].

In the spring of 2008, Abigail Fisher, an eighteen-year-old high school senior from Sugar Land, Texas, sued UT for denying her admission to the class entering in the fall of 2008. ROA.180 [¶48]. Ms. Fisher claimed that UT discriminated against her on the basis of race in violation of her right to equal protection under the Fourteenth Amendment and federal-civil rights statutes. She did not seek to overrule the Supreme Court's decision in *Grutter v. Bollinger. See Fisher v. Univ. of Tex. at Austin* ("*Fisher I*"), 570 U.S. 297, 303 (2013).

Ms. Fisher, like countless other civil-rights plaintiffs before her, received outside assistance. Ms. Fisher's legal fees were paid for by the Project on Fair Representation, a nonprofit legal-defense foundation that supports "the facilitation of pro bono legal representation to individuals and entities that wish to challenge government distinctions

and preferences made." ROA.1369, 1257:10-20. Edward Blum, a longtime family friend of the Fishers, is the president of the Project and is also on its board of directors. ROA.1270:1-14, 1406. Mr. Blum also gave recommendations to Ms. Fisher about which attorneys she should select and served as a "conduit" between Ms. Fisher and her counsel. ROA.1268:9-15, 1269:21-1270:18. Although Ms. Fisher received assistance from the Project and Mr. Blum, she retained total control over her own lawsuit. ROA.1246:16-20, 1269:21-23.

SFFA had no role in the *Fisher* litigation—indeed, SFFA did not exist until 2014, more than five years after the complaint in *Fisher* was filed. ROA.1298, 1245:9-11. Although Edward Blum serves on the board of directors for both SFFA and the Project, they are entirely separate organizations. ROA.1410. The Project is not a parent, subsidiary, or affiliate of SFFA. ROA.1410. SFFA is governed by different bylaws and articles of incorporation, has a different board of directors, and is a membership organization (unlike the Project). ROA.1410. The Project has "no role whatsoever in the management or direction of SFFA or this litigation." ROA.1410.

The district court granted UT summary judgment, *Fisher v. Univ. of Tex. at Austin*, 645 F. Supp. 2d 587 (W.D. Tex. 2009), and this Court affirmed, *Fisher v. Univ. of Tex. at Austin*, 631 F.3d 213 (5th Cir. 2011). The U.S. Supreme Court, however, granted certiorari and vacated this Court's decision. The Supreme Court held that this Court had failed to apply the correct standard of strict scrutiny. *See Fisher I*, 570 U.S. at 297.

On remand, this Court (with Judge Garza dissenting) affirmed the grant of summary judgment to UT. *Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633 (5th Cir. 2014).

In 2016, in a 4-3 decision, the Supreme Court affirmed, holding that UT's use of racial classifications and admissions preferences—as implemented in 2008—satisfied strict scrutiny. *Fisher II*, 136 S. Ct. at 2208-15. Although it rejected Ms. Fisher's claims, the Court emphasized that it had only resolved the "narrow question" of whether Ms. Fisher was denied equal treatment "at the time her application was rejected." *Id.* at 2210. The Court warned that its "affirmance of the University's admissions policy today does not necessarily mean the University may rely on that same policy without refinement." *Id.* at 2215. UT has an "ongoing obligation to engage in constant deliberation and continued reflection regarding its admissions policies," the Court stressed. *Id.* In particular, the Court noted that "studies undertaken over the eight years since" 2008, when Ms. Fisher applied to UT, "may be of significant value in determining the constitutionality of the University's current admissions policy." *Id.* at 2209. Unlike the record before the Court, which was "almost devoid of information about the students who secured admission to the University through the [Top Ten Percent] Plan," future courts would be able to assess "how students admitted solely based on their class rank differ in their contribution to diversity from students admitted through holistic review." *Id.*

Thus, the Court cautioned, "[t]he type of data collected [since 2008], and the manner in which it is considered, will have a significant bearing on how [UT] must

shape its admissions policy to satisfy strict scrutiny in the years to come." *Id.* at 2210. UT's admissions policies would survive strict scrutiny only if the university "tailor[ed] its approach in light of changing circumstances, ensuring that race plays no greater role than is necessary to meet its compelling interest," and only if UT used the "valuable data" it collected to "scrutinize the fairness of its admissions program"; to "assess whether changing demographics have undermined the need for a race-conscious policy"; and "to identify the effects, both positive and negative, of the affirmative-action measures it deems necessary." *Id.* at 2210, 2214-15.

## IV.    Proceedings Below

On July 20, 2020, SFFA sued UT for racial discrimination in its admissions process.[2] ROA.25. SFFA's amended complaint alleges that UT violates Title VI and sections 1981 and 1983 in four ways: by failing to use race merely as a "plus" factor; by using race where there are workable race-neutral alternatives; by engaging in racial balancing; and by using race as a factor in admissions at all. ROA.67-75. SFFA sued on

---

[2] SFFA previously filed two lawsuits against UT in state court. In the first case, the court found that SFFA's standing member, who was a music major, was evaluated on music factors and so race played no role in the decision to deny her admission to UT. *See* ROA.974 (Amended Order Granting Plea to the Jurisdiction, *SFFA v. Univ. of Tex. at Austin*, No. D-1-GN-17-2930 (53d Jud. Dist. Ct. Travis Cty., Tex. Dec. 28, 2018)). The court dismissed the case because the standing member lacked standing to sue in her own right. *See id.* UT does not dispute that SFFA's standing members here have standing to sue in their own right. *See* ROA.777-86. SFFA's second case in state court was nonsuited without prejudice after minimal discovery and before any dispositive motions were filed. *See* ROA.999.

behalf of its members, including two white students who were denied admission to UT and who are ready and able to apply to transfer if UT stops racially discriminating. ROA.174-75 [¶¶3-8], 1228 [¶¶20-21], 1280:9-12, 1290:3-10, 1292:2-5, 1395 [¶¶4-7, 9-11], 1398-99 [¶¶3-6], 1401-02 [¶¶3-6]. Neither standing member had anything to do with the *Fisher* litigation (they were in elementary school).[3]

In its amended complaint, SFFA alleged, among other things, that "[t]hings have changed dramatically since 2008 when Abigail Fisher was rejected by UT-Austin." ROA.190 [¶99]. For example, there has been "a steady increase in racial diversity since 2008." ROA.190 [¶100]. Whereas "the majority of those admitted to UT-Austin [in 2008] (51%) were white," in 2018 "barely a third of those admitted to UT-Austin (36%) were white." ROA.191 [¶¶101-02]. Because the "race-neutral Top Ten Percent Plan has driven this increased diversity," UT has "a ready-made formula for achieving racial diversity": "maintain or increase the use of the Top Ten Percent Plan and admit the rest through race-neutral means." ROA.191, 193 [¶¶103, 111].

In addition, new evidence shows that UT has been "racially balanc[ing] its entering freshman class to ensure a specific proportional representation of African-American students." ROA.205 [¶168]. Since 2008, UT's "admitted class was 5% African

---

[3] As in its other cases, SFFA anticipates that it will identify more standing members as this case progresses and UT continues to deny admission to SFFA's members. *See, e.g., Harvard*, 346 F. Supp. 3d at 192 n.15 (discussing "the seven new Standing Members identified by SFFA" as the case progressed); ROA.1405.

American in *nine out of the past ten years*." ROA.206 [¶171]. UT has also *increased* its reliance on race after *Fisher II*. ROA.190 [¶98]. From 2008 through 2017, UT publicly reported that "racial/ethnic status" was a factor that was merely "considered" in the admissions process. ROA.190 [¶97]. But in 2018, two years after *Fisher II*, UT began reporting that an applicant's "racial/ethnic status" is now a "very important" factor in UT's admissions decisions. ROA.190 [¶98]. Thus, UT's admissions policies—as implemented today—cannot survive strict scrutiny. ROA.211-21 [¶¶198-244].

Over SFFA's objection, the district court bifurcated discovery, prohibiting SFFA from taking any discovery into the merits of its claims until the court resolved UT's motions related to standing and res judicata. ROA.524-26. After UT answered SFFA's complaint, SFFA and its standing members were deposed and SFFA produced documents and responded to interrogatories. Because of the district court's scheduling order, SFFA never got the chance to conduct discovery into the merits of its claims.

On March 8, 2021, UT moved for summary judgment. ROA.22. Like Harvard and UNC, UT argued that SFFA lacked standing because SFFA wasn't a traditional membership organization and its members lacked the "indicia of membership." ROA.777-86. UT also argued that SFFA wasn't a traditional membership organization because it does not have "statutory members" under Virginia law, the State where SFFA was incorporated. ROA.779. In addition, UT argued that SFFA's lawsuit was prohibited under res judicata (claim preclusion) and collateral estoppel (issue preclusion) because

Mr. Blum and Ms. Fisher were involved in both the *Fisher* litigation and this litigation. ROA.786-95.

A group of students and student organizations were allowed to intervene as defendants. They likewise moved to dismiss for lack of standing. Unlike UT, the intervenors argued that SFFA's members lacked standing to sue in their own right. ROA.622-43.

**B.**     In July 2021, the district court granted in part and denied in part the motions for summary judgment. ROA.1522-46. The court first held that SFFA had standing to bring this lawsuit. The district court found no authority for UT's argument that "having no members under the meaning of the Virginia Nonstock Corporation Act precludes an organization from defining members in its bylaws or otherwise being a traditional membership organization." ROA.1532. Following the courts in *Harvard* and *UNC*, the district court found that SFFA was a "traditional membership organization" and thus could bring this lawsuit on behalf of its members. ROA.1530-32. The district court also rejected intervenors' standing arguments. SFFA's members had "standing to sue in their own right" because—like the plaintiffs in virtually every race-based admissions case—they were "'denied the opportunity to compete for admission . . . on equal footing . . . on the basis of race" and they stand "ready and able to apply to transfer" if UT's "discriminatory admissions policies" are invalidated. ROA.1532-34.

The district court still dismissed the case, however, because it found that SFFA's claims were barred under claim preclusion. It concluded that SFFA could not challenge

UT's admissions program in 2020 because Abigail Fisher had challenged UT's admissions program in a 2008 lawsuit against UT. Ms. Fisher's suit barred SFFA's suit, according to the district court, for two main reasons.

First, the court held that SFFA was in "privity" with Ms. Fisher. ROA.1536-39. The district court acknowledged that SFFA was not a party to the *Fisher* litigation, and the court didn't find that any of the recognized exceptions for nonparty preclusion applied. ROA1536-39. Yet the district court found privity because "Fisher and Blum . . . exert control over this lawsuit as directors of SFFA" and "[e]ither Blum or Fisher controlled the previous litigation in *Fisher*." ROA.1537-39. The district court also found that Mr. Blum was the "architect" of both the *Fisher* litigation and SFFA's lawsuit here, and that these "roles" were "sufficient for privity." ROA.1538.

Second, the district court held that this case and the *Fisher* case "'involve[d] the same claim or cause of action.'" ROA.1540-43 (quoting *United States v. Davenport*, 484 F.3d 321, 326 (5th Cir. 2007)). The claims in these cases, the district court reasoned, "both challenge UT Austin's consideration of race in its holistic review process, both allege discrimination and assert equal protection violations, and both seek injunctive relief to prevent UT Austin from using race as a factor in admissions decisions." ROA.1540. The district court acknowledged several differences between the two cases, including that SFFA is suing on behalf of its members (not Ms. Fisher) and that more than 12 years had passed since Ms. Fisher brought her lawsuit. ROA.1540-41. But it found these differences irrelevant because "the substance of the alleged discrimination

is the same," and SFFA alleged no "'significant'" facts that "create[] 'new legal conditions." ROA.1541 (quoting *Wilson v. Lynaugh*, 878 F.2d 846, 851 (5th Cir. 1989). Because the court found SFFA's claims barred by claim preclusion, it didn't reach UT's argument that SFFA's claims were also barred by collateral estoppel. ROA.1543.

## SUMMARY OF ARGUMENT

Because "racial classifications so seldom provide a relevant basis for disparate treatment, the Equal Protection Clause demands that racial classifications be subjected to the most rigid scrutiny." *Fisher I*, 570 U.S. at 309-10 (cleaned up). And UT's obligation to satisfy this strictest form of scrutiny is "ongoing." *Fisher II*, 136 S. Ct. at 2215. Yet the district court relieved UT of that continuing obligation. It held that SFFA's lawsuit is claim precluded because one of SFFA's five directors, Abigail Fisher, sued UT *more than a decade ago*, and another of SFFA's directors, Edward Blum, assisted her. This holding finds no support in law, fact, or logic. It must be reversed for two primary reasons.

***First***, SFFA is neither "identical" to nor in "privity" with Ms. Fisher. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 571 (5th Cir. 2005). Because of our "'deep-rooted historic tradition that everyone should have his own day in court,'" *Taylor v. Sturgell*, 553 U.S. 880, 892-93 (2008), preclusion against a plaintiff that was not a party to the prior lawsuit is rare and disfavored. In line with the Supreme Court in *Taylor*, *id.* at 893-95, this Court has recognized "just three narrowly-defined" exceptions to nonparty preclusion. *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990). These

exceptions "constitute an exhaustive list," and it is UT's burden to prove that one applies. *Duckett v. Fuller*, 819 F.3d 740, 745 (4th Cir. 2016).

The only nonparty preclusion exception that the district court pointed to was the "control" exception—where nonparty preclusion is allowed because "the non-party controlled the prior litigation." *Meza*, 908 F.2d at 1266. Yet the district court never actually found that the exception applied. The nonparty here, SFFA, did not exist until 2014—more than five years after the *Fisher* lawsuit was filed—and had no role in the *Fisher* litigation. Instead, the district court found that two of SFFA's *directors* were involved in the *Fisher* litigation. But this "close enough" approach to nonparty preclusion flouts Supreme Court precedent, which demands "'crisp rules with sharp corners.'" *Taylor*, 553 U.S. at 898-901. Because UT cannot satisfy any of the recognized exceptions for nonparty preclusion, this is an easy case—nonparty preclusion is not allowed.

***Second***, SFFA's case does not involve "the same claim or cause of action" as the *Fisher* case. *Test Masters Educ. Servs.*, 428 F.3d at 571. Two cases involve the same claim or cause of action when they constitute the same "'transaction'" or "'series of transactions.'" *Id.* This transactional test turns on whether the facts of the two cases are "related in time, space, origin, or motivation [and] whether they form a convenient trial unit." *Id.*

Here, there are significant differences between SFFA's claims and Ms. Fisher's claims. They involve different named plaintiffs, different victims of discrimination,

different time periods, different uses of race, different violations of federal law, different race-neutral alternatives, and different forms of requested relief. They are not remotely close to the same "transaction" or "series of transactions."

The district court's contrary conclusion is wrong. It held that the two cases raised the same claim or cause of action because Ms. Fisher and SFFA both challenged the constitutionality of UT's admissions process. According to the district court, the differences in the two cases are irrelevant because "the substance of the alleged discrimination is the same" and the relevant events "'were directly related to each other in terms of motivation and common purpose.'" ROA.1541 (quoting *Havercombe v. Dep't of Educ. of Com. of P.R.*, 250 F.3d 1, 6 (1st Cir. 2001)). Thus, the district court believed, SFFA could avoid preclusion only if it proved that there had been "'significant'" changes in facts that "create[d] 'new legal conditions.'" ROA.1541 (quoting *Wilson*, 878 F.2d at 851).

No court—including this one—has ever imposed such a test. And none of the cases that the district court relied on come anywhere close to the facts here. But even under the district court's test, SFFA should prevail. The "substance of the alleged discrimination" is not the same in both cases, the relevant events are not "directly related to each other," and there have been "significant" changes in facts since Ms. Fisher sued UT in 2008, more than a decade ago.

Ms. Fisher had her day in court. SFFA should too. This Court should reverse.

## STANDARD OF REVIEW

"The court reviews, *de novo*, a district court's award of summary judgment, applying the same standard as the district court." *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010). Summary judgment is proper only if the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court is "'obliged to construe all the evidence and reasonable inferences deduced therefrom in a light most favorable to [SFFA], the nonmoving party.'" *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 226 (5th Cir. 2009). Because claim preclusion is an affirmative defense, UT must have "insurmountable proof" and establish "beyond peradventure *all* of the essential elements of the defense to warrant judgment in [its] favor." *Joseph on behalf of Estate of Joseph v. Bartlett*, 981 F.3d 319, 329 (5th Cir. 2020); *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (cleaned up); *see Transp. Concepts, Inc. v. San Fran. French Bread Co.*, 2000 WL 1175642 (N.D. Tex. Aug. 17, 2000) ("[R]es judicata is an affirmative defense as to which defendants will have the burden of proof at trial," and so "to obtain summary judgment, [defendants] must establish beyond peradventure all of the essential elements of the defense." (cleaned up)).

## ARGUMENT

SFFA's claims are not precluded by *Fisher* unless UT makes four showings: "(1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a

final judgment on the merits; and (4) the same claim or cause of action was involved in both actions." *Test Masters Educ. Servs.*, 428 F.3d at 571. Because UT cannot satisfy either the first or fourth element, SFFA's claims are not precluded.

## I.    SFFA's lawsuit is not precluded because SFFA was not a party in the *Fisher* litigation and is not in privity with Abigail Fisher.

1. A "basic premise of preclusion law" is that a court's judgment "binds only the parties to a suit, subject to a handful of discrete and limited exceptions." *Smith v. Bayer Corp.*, 564 U.S. 299, 312 (2011); *see Meza*, 908 F.2d at 1266 ("It is a fundamental principle of American jurisprudence that a person cannot be bound by a judgment in litigation to which he was not a party."). The "importance of this rule and the narrowness of its exceptions go hand in hand." *Smith*, 564 U.S. at 313. Preclusion against a nonparty is a high bar because it "runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Taylor*, 553 U.S. 892-93 (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 798 (1996)). Indeed, "[t]he prohibition against using the result of prior judicial proceedings to determine the rights of strangers to those proceedings is required by the due process guarantees of the Fifth and Fourteenth Amendments." *Meza*, 908 F.2d at 1266.

Because of the "'fundamental nature of the general rule' that only parties can be bound by prior judgments," the Supreme Court has "taken a 'constrained approach to nonparty preclusion.'" *Smith*, 564 U.S. at 313 (quoting *Taylor*, 553 U.S. at 898); *see also Clyce v. Farley*, 836 F. App'x 262, 269 (5th Cir. 2020) ("[N]onmutual claim preclusion is

'generally disfavored.'"). In *Taylor*, the Supreme Court identified only six exceptions to the rule against nonparty claim preclusion: (1) where the nonparty "agrees to be bound by the determination of issues in an action between others"; (2) where there is a "pre-existing substantive legal relationship[]" between the nonparty and a party in the action, such as "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor"; (3) when, "in certain limited circumstances," the nonparty was "adequately represented by someone with the same interests who was a party," such as "properly conducted class actions" and "suits brought by trustees, guardians, and other fiduciaries"; (4) where the "nonparty . . . assumed control over the litigation in which that judgment was rendered"; (5) where the nonparty serves as a "proxy" for the party that is bound by a prior judgment; and (6) where a "special statutory scheme" expressly forecloses successive litigation by nonlitigants. *Taylor*, 553 U.S. at 893-95 (cleaned up).

"These six exceptions to the rule against nonparty claim preclusion constitute an exhaustive list," *Duckett*, 819 F.3d at 745, and "the party seeking to invoke res judicata against a party who was not a party to the previous litigation bears the burden of demonstrating that a *Taylor* exception applies," *CentraArchy Rest. Mgmt. Co. v. Angelo*, 806 F. App'x 176, 179 (4th Cir. 2020); *see Duckett*, 819 F.3d at 745-47 (no claim preclusion because the defendants couldn't "meet their burden of demonstrating the applicability of any of the six *Taylor* exceptions to the rule against nonparty preclusion"); *Grayson v. Warden, Comm'r, Ala. DOC*, 869 F.3d 1204, 1224 (11th Cir. 2017) (holding that a prior decision "can . . . have no preclusive effect" where "[n]one of th[e] [*Taylor*] exceptions

apply"); *Doe v. Hesketh*, 828 F.3d 159, 172 (3d Cir. 2016) (finding no privity because "[w]e assess privity under the rubric laid out by the Supreme Court in *Taylor*" and none of the six categories applied); *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 312-14 (3d Cir. 2009) (same).

This Court has taken the same approach, both before and after *Taylor*. It has found "privity"[4] between the party and nonparty to justify nonparty claim preclusion in "just three, narrowly-defined circumstances," which essentially duplicate three of the *Taylor* exceptions: "(1) where the non-party is the successor in interest to a party's interest in property; (2) where the non-party controlled the prior litigation; and (3) where the non-party's interests were adequately represented by a party to the original suit." *Meza*, 908 F.2d at 1266. This Court thus has repeatedly refused to find nonparty preclusion when the defendants couldn't satisfy one of these three "narrowly-defined" categories. *See, e.g., id.*; *Clyce*, 836 F. App'x at 269-71; *White v. Fox*, 576 F. App'x 327, 331-32 (5th Cir. 2014); *In re Hinsley*, 149 F.3d 1179, *8-10 (5th Cir. 1998) (unpublished); *NAACP v. Fordice*, 105 F.3d 655, *2-3 (5th Cir. 1996) (unpublished); *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 188-90 (5th Cir. 1990); *Benson & Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1175-76 (5th Cir. 1987).

---

[4] In *Taylor*, the Supreme Court used the term "nonparty preclusion" instead of the term "privity" to "ward off confusion," as the term "privity" has often been used "broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground." 553 U.S. at 894 n.8; *Grayson*, 869 F.3d at 1224 ("Collectively, [the *Taylor*] exceptions are commonly described using the catchall term 'privity.'").

Despite the express direction by this Court and the Supreme Court that only these narrowly defined exceptions can be invoked against a nonparty to prior litigation, the district court never found that *any* of the recognized exceptions were satisfied. ROA.1535-39. Nor did UT ever argue that any of these exceptions applies. ROA.786-90, 1460-63. That failure is dispositive.

The district court didn't find any of the established exceptions for a reason—none applies:

1)  SFFA did not "'agree[] to be bound'" by the judgment in *Fisher*. *Taylor*, 553 U.S. at 893.

2)  There is no "pre-existing 'substantive legal relationship'" between SFFA and Ms. Fisher, such as "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Taylor*, 553 U.S. at 894; *Meza*, 908 F.2d at 1266 (allowing preclusion where the nonparty is a "successor in interest to a party's interest in property").

3)  SFFA's interests were not "'adequately represented'" by Ms. Fisher because *Fisher* was not a class action and Ms. Fisher was not a "trustee[], guardian[], [or] other fiduciar[y]" for SFFA. *Taylor*, 553 U.S. at 894; *see Meza*, 908 F.2d 1272-73.

4)  SFFA did not "'assume[] control' over the [*Fisher*] litigation" because SFFA didn't have "'effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action'" and "'control over the opportunity to obtain review.'" *Taylor*, 553 U.S. at 894; *Benson & Ford*, 833 F.2d at 1174. Indeed, SFFA *did not exist* until 2014—more than five years after the complaint in *Fisher* was filed. ROA.1298. And even after it was formed, SFFA had no role whatsoever in the *Fisher* litigation. ROA.1245:9-11, 1410.

5)  SFFA did not serve as a "proxy" for Ms. Fisher. *Taylor*, 553 U.S. at 895.

6)  There is no "special statutory scheme [that] expressly foreclose[s] successive litigation by nonlitigants." *Id.* (cleaned up).

25

Because none of the *Taylor* exceptions or this Court's exceptions apply, SFFA is not precluded from bringing this lawsuit.

2.  Instead of following *Taylor* and this Court's precedent, the district court held that SFFA shouldn't be allowed to pursue this case because two of SFFA's directors were also involved in the *Fisher* litigation. According to the district court, SFFA's claims were barred because "Fisher and Blum both exerted control over the litigation in *Fisher* and exert control over this lawsuit as directors of SFFA." ROA.1539. The district court also believed that "Blum's roles as the architect of the *Fisher* litigation and this lawsuit are sufficient for privity." ROA.1538.

The district court's "'heavily fact-driven'" and "'close enough'" approach to nonparty preclusion is "at odds with the [Supreme Court's] constrained approach to nonparty preclusion." *Taylor*, 553 U.S. at 898. Nonparty claim preclusion is proper only if the case fits squarely within one of the recognized exceptions. The Supreme Court has "delineate[d] discrete grounds" for nonparty preclusion because "'this area of the law'" requires "'crisp rules with sharp corners,'" not a "'round-about doctrine of opaque standards.'" *Id.* at 898, 901. A heavily factual approach, like the one the district court employed below, "create[s] more headaches than it relieves," as courts must "evaluate [the facts] under a standard that provides no firm guidance." *Id.* at 901. The district court's sense that the facts here were "'close enough'" to warrant preclusion was an error of law. *Id.* at 898.

To be sure, the district court also pointed to the "control" exception to nonparty claim preclusion, ROA.1539 (citing *Meza*, 908 F.2d at 1266 (allowing preclusion "where the non-party controlled the prior litigation")); but the court never actually concluded that this exception applied, ROA.1536-39. Nor could it, because SFFA had nothing to do with the *Fisher* litigation. When *Fisher* was filed in the spring of 2008, Abigail Fisher was an eighteen-year-old high school student who had just been rejected by UT for the Fall 2008 class. ROA.1004 [¶¶7-8]. SFFA, by contrast, is a 501(c)(3) voluntary membership organization that did not come into existence until 2014, more than *five years* after the *Fisher* lawsuit was filed. ROA.1298. And even then, SFFA had no role whatsoever in the *Fisher* litigation. ROA.1245:9-11, 1410.

The most that could be said is that two of SFFA's *directors* (Ms. Fisher and Mr. Blum) were involved in the *Fisher* litigation in their personal capacities. Ms. Fisher was the named plaintiff, and Mr. Blum assisted her in her efforts. *Supra* 10-11. But it is hornbook law that an organization "cannot be bound simply because a director, officer, or minor shareholder has lost an action pursued in an individual capacity." Wright, Miller, & Cooper, 18A Fed. Prac. & Proc. §4460 (3d ed. 2021); *accord* Rest. (2d) of Judgments §59, cmt. a (1982) ("[A] judgment for or against persons who are stockholders, members, or managers of a corporation does not in general bind or redound to the benefit of the corporation."); *Johnson v. City of Houston*, 444 F. App'x 26, 31 (5th Cir. 2011) ("'[T]he control principle cannot apply to a person who, as a party, controls litigation in one capacity, and then is involved in subsequent litigation in

27

another capacity.'" (quoting Wright, Miller, & Cooper, 18A Fed. Prac. & Proc. §4451 (2d ed. 2002)). SFFA cannot be precluded from bringing its own suit merely because one of its directors had an earlier suit in her personal capacity against the same defendant, and another one of its directors assisted the plaintiff in that suit through a different organization. *See, e.g.*, *Johnson*, 444 F. App'x at 31 (same plaintiff brought both actions, but finding no privity because "the identity requirement for claim preclusion is not fulfilled when a person participates in two different suits in different capacities").

The district court concluded—in a blatant misreading of the facts—that "[Abigail] Fisher and Blum still effectively control at least three, if not four, of the five board seats and exert immense control over the litigation at hand." ROA.1539. That is wrong. Mr. Blum and Ms. Fisher are only two of five directors. ROA.1406-07. The three other directors (Joe Zhou, Eva Guo, and Richard Fisher) can outvote Mr. Blum and Ms. Fisher on every issue and, if desired, remove them from their positions on the Board of Directors and as SFFA officers. ROA.1247:22-1248:4, 1309, 1311. Nor is there a shred of evidence that the three directors are somehow beholden to Ms. Fisher and Mr. Blum. The district court's only evidence that Ms. Fisher and Mr. Blum "controlled" the rest of the Board was (1) a statement from Mr. Blum mistakenly referring to himself, Abigail Fisher, and Richard Fisher as "permanent directors," ROA.848:1-15, which Mr. Blum later corrected, ROA.1247:15-1248:4, 1258:24-1259:15; and (2) the fact that Mr. Blum typically leads the discussion when he has his regular conference calls with SFFA members, ROA.934:2-935:15. None of this comes

remotely close to showing that Mr. Blum and Ms. Fisher, a minority of SFFA's board of directors, somehow control SFFA. *Cf. FDIC v. Henderson*, 61 F.3d 421, 430-31 (5th Cir. 1995) (discussing the strong "presumption" that directors "exercise independent judgment").

Moreover, Mr. Blum did not "control" the *Fisher* litigation—Ms. Fisher did. Although Mr. Blum assisted Ms. Fisher in finding attorneys and the Project paid for her legal fees, Ms. Fisher retained total control over her own litigation. ROA.1246:16-20, 1269:21-23. Thus, preclusion would be improper even if Mr. Blum were the "nonparty" that brought the case here. "In order for a prior judgment to bind a nonparty on the basis that [he] controlled the prior litigation, 'it is not enough the nonparty supplied an attorney or is represented by the same law firm; helped to finance the litigation; appeared as an amicus curiae; testified as a witness; participated in consolidated pretrial proceedings; undertook some limited presentations to the court; or otherwise participated in a limited way." *In re Hinsley*, 149 F.3d 1179, at *10 (quoting *Benson & Ford*, 833 F.2d at 1174). The nonparty instead must "'have effective choice as to the legal theories and proofs to be advanced in behalf of the party to the action'" and "'have control over the opportunity to obtain review.'" *Benson & Ford*, 833 F.2d at 1174; *see Taylor*, 553 U.S. at 894 (same). Mr. Blum never had this "control" over the *Fisher* litigation.

4.   The district court placed too much weight on *Ferris v. Cuevas*, 118 F.3d 122 (2d Cir. 1997), an out-of-circuit, pre-*Taylor* case applying New York state preclusion

law. In *Ferris*, the Second Circuit found nonparty claim preclusion under New York law because an attorney was the named party and counsel in the first action and also the counsel to different parties in the second action. *Id.* at 127-30. But shared "control" by the same attorney is not a recognized exception under *Taylor* or this Court's precedent. Indeed, "the plaintiffs in *Taylor* shared an attorney, too—yet the Supreme Court gave no weight to that fact when it reversed the lower courts' finding of res judicata." *Leaf v. Refn*, 742 F. App'x 917, 925 (6th Cir. 2018). Moreover, "unlike the instant case, the appellants in *Ferris* made a crucial concession, having 'admitted that their interest [was] identical to that of the prior plaintiffs and, thus, was represented in that action.'" *Id.* (quoting *Ferris*, 118 F.3d at 128).

5.  Finally, the district court ignored the serious due-process implications of its holding. Through this lawsuit, SFFA is seeking declaratory and injunctive relief on behalf of its members, including its two standing members who were denied admission to UT and who are ready and able to apply to transfer if UT stops racially discriminating. *Supra* 13-14. These types of associational suits protect the rights of injured individuals by providing them "the means by which they express their collective views and protect their collective interests." *Hunt*, 432 U.S. at 345. If SFFA prevails, its members will finally have "the opportunity to compete for admission [to UT] on an equal basis." *Gratz*, 539 U.S. at 262.

Yet the district court's decision ensures that SFFA's members will be denied "'[their] own day in court.'" *Taylor*, 553 U.S. at 893. Despite "the long line of cases

understanding equal protection as a personal right," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 230 (1995), the district court barred SFFA's members from vindicating their constitutional rights because one of SFFA's directors filed a lawsuit in her personal capacity—more than 13 years ago—and another SFFA director assisted her. The Constitution prohibits that result. *Id.*

## II. SFFA's lawsuit is not precluded because this case and *Fisher* do not involve the same claim or cause of action.

1. This Court has adopted the "transactional test of the Restatement (Second) of Judgments, §24" to determine whether two suits involve "the same claim or cause of action." *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004). Under the transactional test, "the preclusive effect of a prior judgment extends to all rights the original plaintiff had 'with respect to all or any part of the transaction, or series of connected transactions, out of which the [original] action arose.'" *Id.* (quoting Rest. (2d) of Judgments, §24(1)). What grouping of facts constitutes a "'transaction'" or a "'series'" of transactions must be "'determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.'" *Id.* (quoting Rest. (2d) of Judgments, §24(2)). The "'critical issue'" is "'whether the two actions under consideration are based on the *same nucleus of operative facts*.'" *Id.* "[O]bservations of factual similarity . . . are not relevant"—there must be "sameness." *Id.* at 396.

Here, there is no single "transaction" or "series of transactions" uniting SFFA's case with *Fisher*. That's true for three main reasons.

**First**, the two cases are not "'related in time [or] space.'" *Petro-Hunt*, 365 F.3d at 396. SFFA's case was filed in July 2020—*more than 12 years* after *Fisher* was filed. And even though *Fisher II* was decided in 2016, none of the events that occurred after 2008 affected the Supreme Court's decision. The relevant question in *Fisher* was whether Ms. Fisher had "shown by a preponderance of the evidence that she was denied equal treatment *at the time her application was rejected*." *Fisher II*, 136 S. Ct. at 2210 (emphasis added); *see also id.* at 2209 (refusing to remand for further factfinding because "studies undertaken over the eight years since" Ms. Fisher was denied admission would have "little bearing on whether petitioner received equal treatment when her application was rejected in 2008"); *id.* at 2211-12 (refusing to consider a 2015 report on UT's admissions process); *see also Fisher*, 631 F.3d at 217 (Because "Fisher and Michalewicz lack standing to seek injunctive or forward-looking declaratory relief" and "only have standing to challenge their rejection and to seek money damages for their injury[,] [o]ur focus will be upon the process employed by UT to admit freshmen when Fisher and Michalewicz applied for the class entering fall 2008."). The significant length of time between the two cases weighs heavily against a finding of preclusion. *See, e.g.*, *Wild Fish Conservancy v. EPA*, 331 F. Supp. 3d 1210, 1219 (W.D. Wash. 2018) (no claim preclusion, despite "overlapping facts and law," because "without a time machine, the instant case, which challenges a 2011 action, could not have been brought in 2008"); *Monongalia Cty. Coal*

*Co. v. United Mine Workers of Am., Int'l Union*, 416 F. Supp. 3d 587, 594 (N.D. W. Va. 2019) (no claim preclusion, despite "similar" facts and evidence, because the "the two events . . . occurred three years apart"); *Garcon v. Van Reeth*, 511 F. App'x 877, 881 (11th Cir. 2013) (no claim preclusion where the relevant events occurred "several years apart").

***Second***, SFFA's case and the *Fisher* case are not "'related in . . . origin[] or motivation.'" *Petro-Hunt*, 365 F.3d at 396. SFFA brought this case on behalf of its members to seek forward-looking relief: If SFFA prevails, then its members can apply to UT under an admissions process that no longer discriminates on the basis of race. *Fisher*, by contrast, was brought by two high-school students, Abigail Fisher and Rachel Michalewicz, to recover damages for injuries they personally suffered from their denial of admission in 2008. *Infra* 35. Needless to say, SFFA's lawsuit will not help Ms. Fisher or Ms. Michalewicz—who are both college graduates and in their 30s—gain admission to UT. This difference in origin and motivation also weighs against a finding of claim preclusion. *See, e.g.*, *Hyatt v. US PTO*, 904 F.3d 1361, 1371 (Fed. Cir. 2018) ("Even though Mr. Hyatt could have raised the same *arguments* . . . in his prior suit, his present *claims* arise from a different set of facts unrelated in time, origin, or motivation to his prior . . . claims. Accordingly, claim preclusion does not bar his present claims.")

***Third***, the two cases would never "'form a convenient trial unit.'" *Petro-Hunt*, 365 F.3d at 396. In SFFA's case, the question at trial will be whether UT's *current* race-based admissions process can survive strict scrutiny. *See Grutter*, 539 U.S. at 326. SFFA's case

will concern, among other things, expert analyses of recent UT admissions data, testimony from UT leaders and admissions officers about UT's current admissions policy, and an examination of whether UT, right now, has workable race-neutral alternatives. *Cf. Harvard*, 397 F. Supp. 3d at 136-83 (discussing the parties' expert analysis for "applicant-by-applicant admissions data for more than 150,000 domestic applicants to Harvard's classes of 2014 through 2019," how Harvard's "current admissions policy" works in practice, and whether there are "currently any available or workable race-neutral alternatives"). UT's actions towards Ms. Fisher in 2008 are irrelevant to SFFA's case.

Moreover, the relevant facts have "changed dramatically since 2008." ROA.190 [¶99]. Even if UT's admissions process survived strict scrutiny in 2008, it can't now. "Claim preclusion generally 'does not bar claims that are predicated on events that postdate the filing of the initial complaint.'" *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1596 (2020) (quoting *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2305 (2016)). This is for "good reason." *Id.* "Events that occur after the plaintiff files suit often give rise to new '[m]aterial operative facts' that 'in themselves, or taken in conjunction with the antecedent facts,' create a new claim to relief." *Id.* (quoting Rest. (2d) of Judgments §24, cmt. f).

2.    The district court never examined the relevant Restatement factors, ROA.1540-43, as required by this Court's precedent, *see Petro-Hunt*, 365 F.3d at 396. Instead, it concluded that the two cases involved the same claim or cause of action

because Ms. Fisher and SFFA "both challenge[d] UT Austin's consideration of race in its holistic review process, both allege discrimination and assert equal protection violations, and both seek injunctive relief to prevent UT Austin from using race as a factor in admissions decisions." ROA.1540. But this high-level comparison ignores the significant differences between the cases:

- They involve different plaintiffs (SFFA is a 501(c)(3) organization and Ms. Fisher was an eighteen-year-old high school student).

- They involve different victims of discrimination (SFFA's members versus Ms. Fisher).

- They involve different time periods (SFFA sued in 2020 and Ms. Fisher sued in 2008).

- They involve different uses of race by UT (race was an "important" factor in 2008, but is a "very important" factor now).

- They involve different assessments of and results from race-neutral alternatives (UT's underrepresented minority admissions have soared over the past decade through race-neutral means).

- They involve different violations of the Equal Protection Clause (UT has implemented a quota on African Americans over the past decade).

- They involve different requested forms of relief (SFFA seeks prospective declaratory and injunctive relief, whereas Ms. Fisher could obtain only retrospective damages).[5]

*Supra* 3, 9-15.

---

[5] Although Ms. Fisher asked for declaratory and injunctive relief in her complaint, ROA.1033, she was ultimately not eligible for that relief, *see Fisher*, 631 F.3d at 217 (noting that "Fisher and Michalewicz lack standing to seek injunctive or forward-looking declaratory relief" because "both students deny intention to reapply to UT").

The district court recognized these differences yet found them irrelevant under a new test that it created for discrimination cases. ROA.1541. According to the district court, "judgments bar litigation over later occurring events, where the substance of the alleged discrimination is the same and 'all of [the] events were directly related to each other in terms of motivation and common purpose." ROA.1541 (quoting *Havercombe*, 250 F.3d at 6). But no court—including the Fifth Circuit—has ever adopted such a test, and the district court's cases are easily distinguishable.

In *Havercombe*, an employee sued his employer for a "course of discriminatory conduct" between 1990 and 1997 and, "less than a month" after he prevailed in the first case, brought a second lawsuit against the same defendant for "subsequent discrimination that continued from 1997 until 1999." 250 F.3d at 2-4. The First Circuit found the employee's second case precluded because the employee's two causes of action were essentially the same—in both cases, he was alleging "a pattern and practice of improper acts adding up to a single claim of workplace harassment" during his time in the workplace. *Id.* at 7. Whether the relevant events were "directly related to each other in terms of motivation and common purpose" was not a new test for discrimination cases, *id.* at 6, as the district court here believed, ROA.1541; it was simply "one factor the Restatement instructs us to consider when defining 'transaction' or 'series of connected transactions.'" *Havercombe*, 250 F.3d at 6.

In *Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014), a group of African-American police officers sued the City of Indianapolis, claiming that they were passed

over for promotions based on racially discriminatory testing protocols that the police department administered in 2008. *Id.* at 724. Shortly after their lawsuit was dismissed, the same police officers sued the City again, this time alleging that they were passed over for promotions in 2010 and 2011 based on the same 2008 test. *Id.* at 727. The second suit was precluded, the Seventh Circuit concluded, because "the parties are the same" and except for the fact that the promotions were made in a later promotion cycle, "in every other material respect, the complaint [was] almost identical to the amended complaint in the first suit." *Id.* at 736. None of these "almost identical" similarities exist here.

*Walgreen Co. v. La. Dep't of Health & Hospitals*, 220 F. App'x 309 (5th Cir. 2007) is also inapposite. In *Walgreen*, a company, after losing a facial challenge to state prescription-drug regulations, brought an as-applied challenge to state regulations that were nearly identical to the regulations the company previously challenged. *Id.* at 310-11. This Court found that the lawsuit was precluded because "[t]he basis for [the] as applied challenge is the same as the basis for the [first case]" and the second case was in truth an "impermissible attempt to relitigate a facial challenge to the validity of the regulations." *Id.* at 312. Unlike a facial challenge to a regulation, however, the legality of UT's admissions process is not set in stone. The fact that UT's use of race survived strict scrutiny in 2008 doesn't mean that UT's use of race does so now—more than a decade after the relevant facts in *Fisher* occurred. *See Fisher II*, 136 S. Ct. at 2209-10 (UT

has a "continuing obligation to satisfy the burden of strict scrutiny in light of changing circumstances").

3.  The district court also found that preclusion was proper because SFFA could not show that there had been "'significant'" changes in facts that "'create[d] new legal conditions,'" such as a "'significant'" change in UT's admissions process between 2008 and the present. ROA.1541 (quoting *Wilson*, 878 F.2d at 851). As an initial matter, this "change in circumstances" analysis is not the test for whether "the same claim or cause of action is involved in both actions." *Petro-Hunt*, 365 F.3d at 395. The change-in-circumstances doctrine is an "exception" that a plaintiff can invoke to avoid preclusion if the defendant satisfies the four prongs for claim preclusion. *Preister v. Deutsche Bank Nat'l Trust Co.*, 832 F. App'x 240, 246 (5th Cir. 2020); *Wilson*, 878 F.2d at 850-51 (same). Because UT cannot satisfy its burden of proving that "the same claim or cause of action was involved in both actions," *Petro-Hunt*, 365 F.3d at 395, this Court need not examine whether there has been a "'significant'" change in facts that "'creat[e] new legal conditions,'" *Wilson*, 878 F.2d at 851.

Yet even if a significant change in circumstances is the relevant test for claim preclusion, SFFA meets it. Because UT's admissions process is subject to strict scrutiny, the smallest of factual changes could doom UT's admissions process. *See Fisher I*, 570 U.S. at 310 ("Strict scrutiny is a searching examination, and it is the government that bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." (cleaned up)). And the Court has instructed

that universities must *decrease* their use of race over time. *Grutter*, 539 U.S. at 343 (warning that the Court expects "racial preferences will no longer be necessary" in "25 years"). Moreover, "where 'important human values'" like racial discrimination "'are at stake, even a slight change of circumstances may afford a sufficient basis for concluding that a second action may be brought.'" *Whole Woman's Health*, 136 S. Ct. at 2305 (quoting Rest. (2d) of Judgments §24). That is because if "time and experience eventually show[]" that individuals are being deprived of their constitutional rights, it would "make no sense to prevent" a later lawsuit. *Id.*

The "change in circumstances" alleged in SFFA's complaint are far more than "slight." To begin, SFFA alleged that UT has "increased its reliance on race" since 2008 and SFFA cited to UT's own reporting as evidence. ROA.190 [¶¶97-98]. According to the complaint, "[f]rom 2008 through 2017, UT-Austin publicly reported that 'racial/ethnic status' was a factor that was merely 'considered' in the admissions process. Other factors, such as class rank and the rigor of the student's academic record, were 'very important' in the admission process and thus given more weight in the admissions process." ROA.190 [¶97]. Feeling liberated by *Fisher II*, however, UT "has increased its reliance on race" and "now reports that an applicant's 'racial/ethnic status' is a 'very important' factor in [its] admissions decisions." ROA.190 [¶98]. Despite this well-founded allegation, the district court concluded—even though *no discovery* had occurred—that UT's self-reporting was merely "semantics" and that UT has not, in

fact, meaningfully increased its use of race in the admissions process. ROA.1542. Nothing in the record supports that assumption.

SFFA also alleged that UT is using racial preferences "to achieve a quota of African-American students," as evidenced by the admissions numbers "over the past decade." ROA.205-06 [¶¶167-74]. SFFA's complaint provided the following chart:

| University of Texas at Austin Admissions Share of Total Students Admitted Who Are African American | |
|---|---|
| Year (Class Entering in Summer/Fall) | African American |
| 2009 | 5% |
| 2010 | 5% |
| 2011 | 5% |
| 2012 | 5% |
| 2013 | 5% |
| 2014 | 5% |
| 2015 | 5% |
| 2016 | 5% |
| 2017 | 5% |
| 2018 | 6% |

ROA.205-06 [¶170]. As the chart shows, UT's admission class was "5% African American in *nine out of the past ten years*." ROA.206 [¶171]. This did not "happen by accident." ROA.206 [¶172]. Indeed, SFFA provided evidence that UT "uses its holistic admissions process to ensure that its admitted class of African Americans never strays

from this historic range." ROA.206 [¶173]. For example, "in 2015, when the Top Ten Percent Plan caused the admission of an uncharacteristically high percentage of African-American admissions (7%), UT-Austin correspondingly admitted its lowest ever percentage of African Americans outside of the Top Ten Percent Plan (3%)," causing "the total share of African-American admits [to] balance[] out to 5% of the total admissions." ROA.206-07 [¶174].

Even though "racial balancing . . . is patently unconstitutional," *Grutter*, 539 U.S. at 330, the district court concluded that SFFA's well-founded allegations were irrelevant because UT's African-American admission rate had "'stagnat[ed]'" at 4.1% "in both 1996 and in 2003" and yet UT had still prevailed in *Fisher II*. ROA.1542. But the Supreme Court's reference in *Fisher II* to "consistent stagnation" is inapposite; the Court never found that UT was not engaging in racial balancing during this time period. *See Fisher II*, 136 S. Ct. at 2212. And even if it had, such a holding would be irrelevant to whether UT was engaging in racial balancing *two decades* later. *See id.* at 2209-10.

SFFA next alleged that UT didn't need to use race in the admissions process because the racial diversity at UT has "changed dramatically since 2008" due to the race-neutral Top Ten Percent Plan. ROA.190-94 [¶¶99-112]. In 2008, "the majority of those admitted to UT-Austin (51%) were white. Only 21% of admitted students were Hispanic and 18% of admitted students were Asian." ROA.191 [¶101]. By 2018, however, "barely a third of those admitted to UT-Austin (36%) were white. But the Hispanic and Asian share of the admitted class had increased to 27% and 23%,

respectively." ROA.191 [¶102]. This increased diversity was driven by the Top Ten Percent Plan. ROA.191-93 [¶¶103-10]. For example, "in 2010, among those students admitted through the Top Ten Percent Plan, 44% were white, but only 28% were Hispanic and 17% were Asian." ROA.192 [¶104]. By 2018, however, "those number had changed dramatically. Among those students admitted through the Top Ten Percent Plan, 35% were Hispanic, 30% were white, and 23% were Asian." ROA.192 [¶105]. Thus, SFFA alleged, UT now "has a ready-made formula for achieving racial diversity—maintain or increase the use of the Top Ten Percent Plan and admit the rest through race-neutral means." ROA.193 [¶111].

The district court brushed these facts aside too, finding them irrelevant because the educational benefits of diversity cannot "'be reduced to pure numbers.'" ROA.1542-43 (quoting *Fisher II*, 136 S. Ct. at 2210). But the Court in *Fisher II* said only that "demographics alone" are not "dispositive"; the number of underrepresented minorities admitted through race-neutral means obviously is relevant to whether a university has viable race-neutral alternatives. *See Fisher II*, 136 S. Ct. at 2212. Here, SFFA has alleged that changing demographics since 2008 make it unnecessary for UT to consider race in the admissions process.

SFFA further alleged that UT now can achieve racial diversity by employing race-neutral alternatives in addition to the Top Ten Percent Plan. ROA.194 [¶114]. "Available race-neutral alternatives include but are not limited to: increased use of nonracial preferences; increased use of financial aid, scholarships, and recruitment to

attract and enroll minority applicants; and elimination of admissions policies and practices that operate to the disadvantage of minority applicants." ROA.194 [¶116]; *see* ROA.194-205 [¶¶118-67]. The district court found that these alternatives were "many of the same changes to UT Austin's admissions policy as the Supreme Court addressed in *Fisher.*" ROA.1542-43. But the fact that a race-neutral alternative was unworkable in 2008 doesn't mean that it will never succeed. This is especially true given the dramatic surge in minority admissions that UT has achieved in the past 10 years through race-neutral means. Simply put, if SFFA had the burden to show a "significant" change in facts since 2008, it easily met it.

4.  In the end, the district court effectively held that UT is entitled to a period of immunity following *Fisher II*. But not only does that holding misunderstand strict scrutiny, it ignores the Supreme Court's explicit warnings in *Fisher II*. Because the *Fisher* case was "litigated on a somewhat artificial basis" and there was not "extensive data on the [Top Ten Percent] Plan or the students admitted under it," the Court declared that its decision had "limit[ed] . . . value for prospective guidance." *Fisher II*, 136 S. Ct. at 2209. Moreover, the Court warned, UT had a "continuing obligation to satisfy the burden of strict scrutiny in light of changing circumstances." *Id.* at 2209-10. "Through regular evaluation of data and consideration of student experience, the University must tailor its approach in light of changing circumstances, ensuring that race plays no greater role than is necessary to meet its compelling interest." *Id.* at 2210. Going forward, the "type of data collected, and the manner in which it is considered" would have "a

significant bearing" on whether UT's admissions policy would "satisfy strict scrutiny in the years to come." *Id.* The Supreme Court could not have been clearer on this point.

Yet the district court did not heed the Supreme Court's admonitions. Any of the "operative facts" that saved UT in *Fisher* are insufficient to do so now. SFFA's claims are not barred by claim preclusion.

## CONCLUSION

This Court should reverse the district court.

Respectfully submitted,

  */s/ J. Michael Connolly*

William S. Consovoy
Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
Steven C. Begakis
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
will@consovoymccarthy.com
tom@consovoymccarthy.com
mike@consovoymccarthy.com
cam@consovoymccarthy.com
steven@consovoymccarthy.com

*Counsel for Students for Fair Admissions, Inc.*

## CERTIFICATE OF SERVICE

I filed a true and correct copy of this brief with the Clerk of this Court via the

CM/ECF system, which will notify all counsel.

 */s/ J. Michael Connolly*

*Counsel for Students for Fair
Admissions, Inc.*

**CERTIFICATE OF COMPLIANCE**

This brief complies with Rule 32(a)(7)(B) because it contains 11,464 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it has been prepared in a proportionally spaced font using Microsoft Word 2016 in 14-point Garamond font.

 /s/ J. Michael Connolly

*Counsel for Students for Fair Admissions, Inc.*